**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0001498
29-AUG-2014
08:28 AM**

NO. CAAP-13-0001498

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

DORINDA HAMILTON, Plaintiff/Appellant/Cross-Appellee,
v.
DAVID HAMILTON, Defendant/Appellee/Cross-Appellant

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-D NO. 10-1-163K)

MEMORANDUM OPINION
(By: Foley, Presiding J., Leonard and Ginoza, JJ.)

Plaintiff/Appellant/Cross-Appellee Dorinda Hamilton
(**Dorinda**) and Defendant/Appellee/Cross-Appellant David Hamilton
(**David**) both appeal from the same June 7, 2013 Divorce Decree,
entered in the Family Court of the Third Circuit[1] (**family court**).

On appeal, Dorinda contends the family court erred in
regard to its:

(1) division of David's $3.5 million inheritance, his
$2 million inheritance remaining on December 23, 2011, the date
of the completion of the evidentiary portion of the divorce trial
(**DOCOEPOT**),[2] and the $1.5 million spent by David from his
inheritance during the marriage;

(2) application of equitable deviation principles to
the parties' property division;

---

[1] The Honorable Aley K. Auna, Jr. presided.

[2] On February 13, 2013, the family court filed its "Order Re: Divorce
Trial Held on December 22 and 23, 2011;" which specified that December 22 and
23, 2011 should be considered the DOCOEPOT.

(3) finding of no gift by David to the marital estate;

(4) failure to consider altering the amount and duration of alimony in view of the unequal property division;

(5) failure to compensate Dorinda for a one-sided property division by increasing the amount and/or duration of alimony;

(6) disregard of the findings regarding David's ability to pay, the parties' unequal assets and earning capacity, the length of the 34-year partnership, and the position in which Dorinda would be left after the divorce;

(7) failure to consider the family court's prior order of $2,000 per month in temporary alimony; and

(8) determination of the amount and duration of alimony to be paid to Dorinda.

On cross-appeal, David contends the family court erred by:

(1) fashioning a premarital partnership based on an illegal business venture, where the parties cohabitated but kept their finances separate prior to marriage;

(2) improperly considering David's inheritance related to the division and distribution of property, and the related deviation from the Partnership Model;

(3) awarding Dorinda temporary alimony during the pendency of the divorce proceeding; and

(4) awarding Dorinda attorneys' fees and costs.

## I.   BACKGROUND

In 1976, the parties met and began living together in Auckland, New Zealand.  Dorinda had been studying art history in New Zealand and David was repairing a home and working on a reforestation project.  Subsequently, they made their way to Winchester, Massachusetts, where they lived and worked together at a farm and store owned and operated by David's family.  The parties then moved on to the island of Hawai'i, where they lived until they moved to the island of O'ahu in 1987.

According to Dorinda, while on the island of Hawai'i, David worked on a county road crew and began growing marijuana.

2

Dorinda testified that she "was part of the processing and part of the transportation of growing marijuana[.]" David testified however, that the parties did not have a joint or mutual marijuana operation.

In 1978, the parties purchased property in Pahoa, Hawai'i for $17,000 and jointly constructed a two-story house on the property. Dorinda participated in building the house by setting up, buying supplies, making lunch for the workers, and painting. Dorinda testified that marijuana proceeds were used to jointly purchase the Pahoa property, an approximately nine acre parcel in Glenwood, Hawai'i, titled under David, and another parcel in Volcano, Hawai'i, titled under Dorinda. The Glenwood and Volcano properties were sold prior to the parties' marriage. David denied that any proceeds from marijuana sales were used to purchase real property.

In 1978, the parties traveled to Thailand to look for orchids in order to establish an orchid company with other business partners. Upon their return to the island of Hawai'i, however, Dorinda testified that she and David were no longer part of the prospective orchid company. Dorinda also testified they brought heroin back to Hawai'i and that David sold a portion of it. David testified the parties smuggled heroin back to Hawai'i but he did not sell or barter any of it.

Prior to the marriage, the parties did not share a joint checking account or file joint tax returns. David purchased property prior to the marriage, but did not use Dorinda's money or income. The family court found the parties financially supported each other during their cohabitation before marriage. The family court also found that David worked various jobs while Dorinda contributed services to the parties' living arrangement and also worked on David's parents' farm and store in Massachusetts.

On June 21, 1985, David and Dorinda were married in Hilo, Hawai'i. The parties have two adult children.

In 1987, the parties moved to the island of O'ahu and purchased a home in Kaimuki for $59,000, which Dorinda testified

3

was purchased with proceeds from their marijuana business. From 1987 to 1990, David worked various jobs and Dorinda was a stay-at-home mother. The parties sold their Kaimuki home for $285,000 and moved into a home they purchased in Waimea where they lived from 1990 to 1996.

In 1996, the parties purchased land in Kamuela, Hawai'i in the Anekona Subdivision and built a home (**marital residence**). The appraised value of the marital residence as of the DOCOEPOT was $635,000, with a mortgage and equity loan balance of $391,219 and net market value of $243,781. In 1996, the parties sold the Pahoa and Waimea homes.

From approximately 1996 to 2009 Dorinda worked at the schools her children attended. She was employed as an educational assistant and reading tutor, earning $2,000 a month, and at times health insurance and tuition waivers. Dorinda was laid off from the last school in 2009 and collected unemployment insurance benefits until September 2010, when she began working as a nanny for $1,600 per month.

In 2003, David opened his own general residential real estate brokerage company, Hawaii Properties, USA LLC.; and since January 1, 2006, has been the president and designated realtor of the company. He stated the current compensation structure provided $1,000 per month plus commissions, but no commissions were paid since 2008.

In 2006, David and Dorinda agreed to take out a home equity loan on the marital residence so that David could purchase the office (**Kala Cottage**) that he was using to run his real estate business. David took out an initial credit line of $100,000, using the marital residence as security, in order to keep the real estate business open and to pay the parties' expenses. Dorinda testified that under the agreement "David would repay the loan once he received inheritance from the passing of his father." The parties cosigned a second home equity line loan for $250,000. David testified that he would pay down the initial $100,000 debt as commissions came in. At the DOCOEPOT, approximately $250,000 was still owing on the debt.

Between 2007 and 2011, David inherited from his parents' estates various amounts totaling $3,550,770. David deposited these monies into his separate account at the Bank of Hawaiʻi (**Inheritance Account**). The Inheritance Account had a DOCOEPOT value of $2,051,293 and the family court considered it David's separate property.

Between November 21, 2007 and October 22, 2010, various amounts were disbursed from the Inheritance Account including $180,000 for the purchase of Kala Cottage. Dorinda's expert witness, Gary Kuba (**Kuba**), a certified public accountant, testified that $461,516 was transferred from the Inheritance Account to the joint checking account and used to pay inheritance taxes. Kuba examined records of the Inheritance Account, the parties' joint checking account, a Hawaii Properties account, and a David Curtis Hamilton Personal Account. Kuba testified:

> There [was] nine hundred twenty-six thousand transferred out of [the Inheritance Account] into the joint checking account, three hundred fifty thousand into the David Curtis Hamilton personal account. . . . [T]wo hundred fourteen thousand was transferred into the Hawaii Properties Account . . . . And in addition to that, there was a $180,000 wire transfer for the [Kala] cottage purchase, twenty-five thousand transferred into CardEx, LLC, and then another fifty thousand transferred to Vanguard.

On June 23, 2010, Dorinda filed a Complaint for Divorce. On July 6, 2010, Dorinda filed a Motion and Declaration for Temporary Relief, seeking, in part, a restraining order and temporary alimony. On July 6, 2010, the family court filed its Order to Show Cause for Temporary Relief (**Restraining Order**), which enjoined David from "wasting, transferring, encumbering, or otherwise disposing of marital assets" and restrained him from contacting Dorinda and their daughter.

On September 20, 2010, the family court amended its Restraining Order to exclude the prohibition against David's contact with Elizabeth. On November 10, 2010, the family court entered its Order on Plaintiff's Motion and Declaration for Temporary Relief and Order to Show Cause for Temporary Relief Filed July 6, 2010 (**Order re: Temporary Relief and OSC**). Under this order, both parties were restrained from wasting marital

5

assets. Dorinda was permitted to be the sole occupant of the marital residence and was given sole and exclusive use of a 2009 Suzuki 4x4 (**used car**). David was required to: (1) pay for the parties' and children's medical and dental insurance premiums and any uncovered expenses and overages; (2) pay the mortgage, all insurances, lines of credit, and other fees associated with the marital residence; (3) make the car loan payments on all of the parties' cars; (4) pay all the utilities and be responsible for the credit card debt; (5) pay for the children's higher education expenses; and (6) pay $2,000 per month in spousal support beginning October 1, 2010.

On February 13, 2013, the family court filed its Order Re: Divorce Trial Held on December 22 and 23, 2011 (**Order Re: Divorce Trial**). The family court found the parties had formed a premarital economic partnership in 1976 lasting until they married in 1985. The parties had no written premarital or post-marital agreement.

The family court found David's inheritance of $3,550,770 had a DOCOEPOT value of $2,051,293 and that these remaining monies were David's marital separate property (**MSP**). The family court also found David had withdrawn $1,499,477 from the Inheritance Account and determined that these were Category 3 capital contributions to the marital partnership. The family court also made the following relevant findings:

> 29. Further, in January 2009, [David] received a cash gift from his mother in the amount of $12,000 and this is also considered a Category 3 capital contribution credit.
>
> 30. [David] purchased a saddle valued at $10,000 before he met [Dorinda] in New Zealand. He still own[ed] the saddle at DOCOEPOT. Its value continues to be $10,000. This is considered a Category 1 capital contribution credit.
>
> 31. [David's] total Category 1 and 3 contribution credit is $1,521,477 ($1,499,477 + $12,000 + $10,000).

The family court's allocation chart reflected the total value of the parties' assets as $466,522; David's capital contribution as $1,521,477, and Dorinda's entitlement as (-) $500,081.

The family court found funds withdrawn from David's Inheritance Account were "used for multiple purposes including assisting the family and the family's lifestyle," but that Dorinda did not meet her burden of showing that David intended to make a gift of these funds to her.

In regard to the marital residence, the family court made the following findings:

> 37. The marital residence is Category 5 property.
>
> 38. It would be just and equitable that [David] be awarded the marital residence, subject to all encumbrances thereon.
>
> 39. It would be just and equitable that [Dorinda] vacates the marital residence within 60 days of the filing of the divorce decree.
>
> 40. Further, [David] shall take all necessary steps to remove [Dorinda] as a responsible party from both the mortgage and equity loan within 60 days of the filing of the divorce decree.

The family court determined sufficient valid and relevant considerations (**VARCs**) existed to justify an equitable deviation from marital partnership principles and that it would be just and equitable to give Dorinda a credit of an amount equal to her equalization payment, which the Allocation Chart reflected to be $527,477. The family court considered the following in support of its equitable deviation:

> 57. . . . [Dorinda's] equalization payment to [David] is substantial.
>
> 58. [David's MSP] and Category 1 and 3 capital contribution credits far exceed the value of the property that is being allocated between the parties.
>
> [. . . . ]
>
> 60. [Dorinda] is 57 years old and has been employed from time to time at little over minimum wage over the years that parties have been together. She needs further assistance to meet her needs at the lifestyle she has been accustomed to during the years the parties resided together.
>
> 61. [David] is 59 years old, has worked all his life, has owned and operated several businesses, and has sufficient assets to support himself very well for a number of years.
>
> 62. [David's] employability is much better than [Dorinda's].
>
> 63. [David] is entitled [to] a substantial capital contribution credit due [to] his Category 1 and 3 assets. [Dorinda] will be left with comparably very nominal assets.

Further, [David] has substantial [MSP] he inherited from his parents' estates.

 64. The parties started their [pre-marital economic partnership] in 1976 and have resided together for about 34 years. This is a relatively long relationship.

In regard to spousal support, the Order Re: Divorce Trial including the following findings:

 68. The parties have lived together since 1976 and separated in 2010. Over these approximate 34 years, they have enjoyed a modest life style; raising children together, purchasing and selling real property, operating several businesses, building the marital residence, etc. [David] was the primary bread winner. Although [Dorinda] worked from time to time, she remained primarily a homemaker the majority of the time and generally stayed at home to raise the parties' children and to support the family. The children attended private school and they are now adults.

 69. When [Dorinda] was laid off from Parker School in 2009, she began receiving unemployment benefits. In 2011 she found work as a nanny and makes approximately $1,600 gross a month.

 70. [David] inherited over 3.5 million dollars from his parents' estates resulting in the parties enjoying a relatively higher standard of living. [Dorinda] enjoyed regular therapy, massages, new clothing, and elective cosmetic dental work. [David] enjoyed an expensive vintage car and multiple trips to Southeast Asia. They built a modest home together.

 71. [Dorinda] has received $2,000 per month in court-ordered temporary spousal support.

 72. [Dorinda] is employable, albeit limited, because of her age.

 73. After divorce, [Dorinda] will, however need continued support to pay for her health insurance and other medical expenses as well as to assist her in other daily and monthly expenses.

 74. Following the divorce, [Dorinda] will no longer have the benefit of residing at the marital residence. She will now need further financial assistance.

 75. [David] currently spends about $12,000 per month for family support. He will not live at the marital residence. His monthly expenses will go down.

 76. It would be just and equitable to award [Dorinda] continued spousal support for a period of five years commencing January 2012 (the month following trial), as follows: $2,000 per month until [Dorinda] moves out of the marital residence, then $3,000 per month commencing the first month after [Dorinda] moves out of the marital residence through December 2017.

The Order Re: Divorce Trial also found it just and equitable to allow David to claim Elizabeth as a dependent on his tax returns.

The Order Re: Divorce Trial included a finding of David's "superior financial condition" and on that basis awarded Dorinda "attorney's fees and costs in the amount of up to $5,000."

On February 25, 2013, Dorinda filed a Motion for Reconsideration. Also on February 25, 2013, David filed a Motion for Reconsideration and/or Amendment of Order Re: Divorce Trial Held on December 22 and 23, 2011 (filed on February 13, 2013).

On May 10, 2013, the family court entered its Order Re: Motions for Reconsideration (**Reconsideration Order**). The Reconsideration Order amended the Order Re: Divorce Trial to grant in part and deny in part David's motion for reconsideration by amending Finding No. 76 to state:

> It would be just and equitable to award [Dorinda] continued spousal support for a period of five years commencing January 2012 (the month folling the trial), as follows: $2,000 per month until [Dorinda] moves out of the marital residence, then $3,000 per month commencing the first month after [Dorinda] moves out of the marital residence and through December 2016. Spousal support shall terminate upon [Dorinda's] remarriage or upon the death of either [David] or [Dorinda].

The family court also substituted David's allocation chart for the family court's allocation chart and amended David's chart to eliminate the contribution credit for David's saddle valued at $10,000 and retitled the chart, "Amended Property Allocation Chart."

The Reconsideration Order also amended Finding No. 49 and Finding No. 54 as follows:

> c.  Finding No. 49 shall be amended, as follows: "It would be just and equitable that the bank accounts, securities, retirement accounts, and pensions titled in the parties' individual names be awarded to that party as their sole and separate property. [David] is also awarded the Bank of Hawaii joint checking account, #0138. The values are as noted in the . . . Amended Property Allocation Chart."

> d.  Finding No. 54 shall be amended, as follows: "It would be just and equitable that [Dorinda] be awarded all of the itemized art, furniture, and furnishings requested by her on Page 13 of her Closing Argument filed January 31, 2012. [David] shall be awarded the dishwasher, gas stove, microwave, refrigerator, washer/dryer and the second koa office hair [sic] located in the master bedroom of the marital residence. No credible evidence was presented as to the value of these items."

9

On May 30, 2013, Dorinda's counsel, submitted a declaration of fees and costs pursuant to the Order Re: Divorce Trial.

On June 7, 2013, the family court entered its Divorce Decree (**Divorce Decree**), dissolving the parties' marriage and dividing their property. Parts one through four of the divorce decree concerned the granting of divorce, identification of the parties, support for Elizabeth, and alimony, respectively. Part Five concerned property division between the parties. Parts six through thirteen concerned parties' responsibilities for legal fees, tax matters, future acquisitions, contemplated conveyances and cooperation, enforcement of the divorce decree, a disclaimer regarding paragraph headings used in the divorce decree, Dorinda's surname, and other matters, respectively.

On June 19, 2013, Dorinda filed a timely notice of appeal. David filed a timely notice of cross-appeal on July 2, 2013.

On August 14, 2013, the family court filed its Order Re: Fees and Costs, which ordered David to pay Dorinda's attorney $5,000.

## II. STANDARDS OF REVIEW

### Family Court Decisions

> Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, [an appellate court] will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (quoting In re Doe, 95 Hawai'i 183, 189-90, 20 P.3d 616, 622-23 (2001)). "Furthermore, the burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." Ek v. Boggs, 102 Hawai'i 289, 294-95, 75 P.3d 1180, 1185-86 (2003) (internal quotation marks, citation, and brackets omitted).

### Property Division

> When dividing property in a divorce case, the family court is required to consider all circumstances of the case, exercise its discretion, and make a "just and equitable" division of property. [Hawaii Revised Statutes (HRS)] § 580-47 (1976, as amended). For an appellate court to conclude that there has been an abuse of discretion, it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Raupp v. Raupp, 3 Haw. App. 602, 609, 658 P.2d 329, 335 (1983) (quoting Ahlo v. Ahlo, 1 Haw. App. 324, 619 P.2d 112 (1980)).

"Undue emphasis on a particular factor is abuse of discretion" in division of property by trial court upon divorce under HRS § 580-47. Ahlo, 1 Haw. App. at 329, 619 P.2d at 117 (citing Carson v. Carson, 50 Haw. 182, 436 P.2d 7 (1967)).

"We review the family court's final division and distribution of the estate of the parties under the abuse of discretion standard, in view of the factors set forth in HRS § 580-47 and partnership principles." Tougas v. Tougas, 76 Hawai'i 19, 26, 868 P.2d 437, 444 (1994) (footnote, citation, and internal quotation marks omitted).

## III. DISCUSSION

### A. David's cross-appeal

#### 1.

David contends the family court erred by fashioning a premarital economic partnership around an illegal marijuana-sales enterprise. The family court found, "[i]n 1977, the parties started growing marijuana and both worked growing, processing, transporting the finished product, and selling it." David raised this error to the family court through his Amended Position Statement, filed November 7, 2011, which stated, "[Dorinda] testified that her basis for and what she relies on to form a pre-marital economic partnership was a joint, illegal partnership with [David] to cultivate and distribute marijuana."

"[A] premarital economic partnership is formed when, prior to their subsequent marriage, two people cohabit and apply their financial resources as well as their individual energies to and for the benefit of each other's person, assets, and liabilities." Collins v. Wassell, 133 Hawai'i 34, 45, 323 P.3d 1216, 1227 (2014) (internal quotation marks and brackets omitted)

11

(citing Helbush v. Helbush, 108 Hawai'i 508, 515, 122 P.3d 288, 295 (App. 2005)). The formation of a premarital economic partnership depends on the parties' intentions to do so. Collins, 113 Hawai'i at 45, 323 P.3d at 1227. In the absence of an express agreement, the family court must consider the "totality of the circumstances, including both the economic and non-economic contributions of the parties" to determine whether parties intended to form a premarital economic partnership. Collins, 133 Hawai'i at 46, 323 P.3d at 1228. Relevant considerations include "joint acts of a financial nature, the duration of cohabitation, whether — and the extent to which — finances were commingled, economic and non-economic contributions to the household for the couple's mutual benefit, and how the couple treated finances before and after marriage." Collins, 133 Hawai'i at 46, 323 P.3d at 1228.

The family court considered the parties' joint financial acts, cohabitation since 1976, economic and non-economic contributions, and other financial arrangements in finding that the parties formed a premarital economic partnership in 1976, "[t]hey cohabitated and applied their financial resources, energies, and efforts to and for each other's benefit and for their acquired joint assets and liabilities." One basis for the family court's finding of a premarital economic partnership, however, was the parties' "growing, processing, transporting the finished product, and selling" marijuana in 1977. The possession, distribution, or manufacture of marijuana is illegal in Hawai'i. See HRS §§ 712-1240 (1993 and Supp. 2013), 712-1249.4 (1993), 712-1249.5 (1993). "A partnership formed for illegal purposes or to pursue a lawful purpose in an unlawful manner, is invalid and unenforceable." 59A Am. Jur. 2d Partnership § 50 at 232 (2003) (footnotes omitted).

The existence of a premarital economic partnership is relevant to the family court's division of the parties' property. Collins, 133 Hawai'i 34, 41-42, 323 P.3d 1216, 1223-24 (2014) ("[I]n dividing and distributing property pursuant to HRS § 580-47, premarital contributions are a relevant consideration

12

where the parties cohabited and formed a premarital economic partnership."). The family court was required to consider the following factors in dividing property between the parties:

(1) Financial resources of the parties;

(2) Ability of the party seeking support and maintenance to meet his or her needs independently;

(3) Duration of the marriage;

(4) Standard of living established during the marriage;

(5) Age of the parties;

(6) Physical and emotional condition of the parties;

(7) Usual occupation of the parties during the marriage;

(8) Vocational skills and employability of the party seeking support and maintenance;

(9) Needs of the parties;

(10) Custodial and child support responsibilities;

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13) Probable duration of the need of the party seeking support and maintenance.

HRS § 580-47(a).

HRS § 580-47 confers "wide discretion upon the family court." Gussin v. Gussin, 73 Haw. 470, 479, 836 P.2d 484, 489 (1992). "[HRS §] 580-47 gives to the family court the discretion to divide marital property according to what is just and equitable[.]" Gussin, 73 Haw. at 479, 836 P.2d at 489 (citations and internal quotation marks omitted, format altered). The family court's equitable powers, however, did not authorize it to provide relief to parties to an illegal agreement.

> Equity will not interpose to grant relief to parties to an illegal agreement. In fact, where an agreement is founded on a consideration that is illegal, immoral, or against public policy, a court will leave the parties where it finds them. Ordinarily, equitable relief is denied where the parties are in pari delicto. Accordingly, as a general rule, equity will grant no affirmative relief to a party to an illegal contract who is in pari delicto. Generally, equity will aid neither party to an illegal contract by

> decreeing cancellation if they are in pari delicto, that is,
> equally at fault, but will leave them where it finds them,
> to settle the dispute without the aid of the court.

27A Am. Jur. 2d Equity § 47 at 588 (2008) (footnotes omitted).

Courts have generally refused to enforce illegal agreements for sound public policy reasons:

> The reason for this refusal is not that the courts are
> unaware of possible injustice between the parties, and that
> the defendant may be left in possession of some benefit he
> should in good conscience turn over to the plaintiff, but
> that this consideration is outweighed by the importance of
> deterring illegal conduct. Knowing that they will receive
> no help from the courts and must trust completely to each
> other's good faith, the parties are less likely to enter an
> illegal arrangement in the first place.

Lewis & Queen v. N. M. Ball Sons, 48 Cal.2d 141, 150, 308 P.2d 713 (1957).

In answer to David's contention that no premarital economic partnership existed by reason of the illegal marijuana operation, Dorinda notes the family court did not expressly find the parties' premarital economic partnership was based on an illegal enterprise. Dorinda refers to record evidence of her noneconomic premarital contributions of labor to David's tree-planting project in New Zealand, David's family grocery store, the construction of the parties' Pahoa house, travel to Thailand to research a prospective orchid business, and other factors upon which a legitimate premarital economic partnership could have been based. Dorinda cites David's testimony to support the proposition that "marijuana was 'just a sideline with a few friends,'" "[t]he couple's pre-[date of marriage] properties were purchased entirely with 'savings,'" and that his "testimony was entirely inconsistent with his present claim that 'the illegal business was the foundation of the [premarital economic partnership]."

In response, David states, "[i]t was Dorinda who testified that the marijuana business was the factual predicate underlying the [premarital economic partnership] . . . [and] Dorinda stated the funds gained from that [marijuana] enterprise benefited [sic] the parties and accounted, at least in some part,

to their joint earnings and assets since they did sell 'the finished product[.]'"

The fact that the parties' illegal marijuana operation provided funds for their premarital economic partnership was not determinative of whether the partnership was valid. No evidence presented reasonably supported a finding, that the purpose of the parties' premarital cohabitation and financial arrangements was the growing and sale of marijuana. We therefore reject David's contention that the "illegal business was the foundation of the [premarital economic partnership]." Evidence of the parties' premarital non-marijuana operations would suffice to support a finding that a premarital economic partnership existed between the parties. The family court's Order Re: Divorce Trial contained findings regarding Dorinda's work on David's family's farm and store, the prospective orchid business, the parties' cohabitation since 1976, and various short-term financial arrangements that independently supported the determination that a premarital economic partnership existed as a matter of law. The record shows that from 1976 to 1985, the parties "cohabit[ed] and appl[ied] their financial resources as well as their individual energies to and for the benefit of each other's person, assets, and liabilities" so as to have formed a premarital economic partnership. Collins, 133 Hawai'i at 45, 323 P.3d at 1227.

Although the conclusion that a premarital partnership existed was not an error, the family court's finding that the parties' marijuana operation was part of that premarital economic partnership did constitute an error as a matter of law. The family court should have segregated the illegal marijuana operation from its consideration of the parties' alleged premarital economic partnership. 59A Am. Jur. 2d Partnership § 52 at 233 provides:

> **§ 52 Separation of mixed legal and illegal purposes**
>
> . . . .
>
> Where a partnership's illegal purpose is not pervasive, and legitimate objectives can be segregated, the partnership is valid and enforceable to the extent that its objectives are found lawful. The unlawful objectives must

15

> be severable from the lawful ones. The test is whether the illegality infects and destroys the agreement as a whole, or whether the promise to be enforced is only remotely or collaterally related to the illegal transaction and not illegal in and of itself. The fact that a partnership engages in illegal business activities as a merely incidental part of its primary business does not suffice to invalidate the partnership as a legal entity and preclude the right of accounting for partnership assets received primarily through the legitimate activities of the partnership.
>
> The fact that a particular partnership project is illegal does not render the partnership agreement unenforceable where that project is only one of numerous partnership activities, is never carried out, and the partnership was not formed for the purpose of carrying on an illegal business or for the purpose of conducting a lawful business in an unlawful manner.

(Footnotes omitted.)

The parties' premarital economic partnership was valid to the extent that it included legal partnership activities and its "legitimate objectives" can be segregated from the illegal marijuana business. Id.

The marijuana business was a contributor of property to the parties' premarital economic partnership and, at least according to Dorinda, provided funds for the purchase of the Kaimuki property that was later sold for $285,000. The family court found the parties grew, processed, and sold marijuana in 1977; jointly purchased a $17,000 property; and jointly bought and sold other properties. Dorinda testified that jointly purchased properties were funded by monies from the marijuana business and David denied that any proceeds from marijuana sales were used to purchase real property. Segregating the economic contribution of the marijuana operation to the parties' premarital economic partnership, however, would require a credibility determination regarding Dorinda's and David's testimony as to whether proceeds from the marijuana operations were used to purchase the Pahoa, Glenwood, Volcano, and Kaimuki properties and, further, ascertaining how the proceeds from the subsequent sales of those properties were allocated to marital and legitimate premarital assets.

For these reasons, we vacate the family court's divorce decree, in part, and remand with instructions to re-assess the

parties' property divisions in consideration of a premarital economic partnership, excluding the parties' marijuana operations.

2.

David's second contention is that the family court erred by categorizing and distributing marital property and deviating from the Partnership Model by considering his inherited properties. The family court found the duration of the parties' premarital economic partnership a valid and relevant consideration that supported its decision to apply equitable deviation. Because we conclude the family court's finding of a premarital economic partnership based in part on an illegal marijuana business was reversible error, the family court's application of its finding that a premarital partnership existed to support deviation from the Partnership Model constituted reversible error to the extent the deviation was based on the illegal marijuana business.

3.

David's third contention on cross-appeal is that the family court erred by awarding Dorinda temporary alimony in the amount of $2,000 per month during the pendency of the divorce. David contends the family court should not have considered David's ability to pay the temporary alimony award from monies he inherited.

In its Order re: Temporary Relief and OSC, the family court found

> [David] has historically used his existing inheritance funds for payment of the marital expenses and [Dorinda's] support. Having reviewed [Dorinda's] income and expense statement filed, the [family court] finds that it would be just and equitable to order that in addition to the above support orders, [David] shall pay to [Dorinda] $2000 per month in temporary spousal support beginning October 1, 2010.

David contends the family court should not have required David to pay temporary alimony from his inheritance funds for the same reasons that the family court was not authorized to distribute marital separate property to Dorinda.

MSP is property owned by one or both of the spouses at the time of the divorce and includes property: (1) excluded from

17

the marital partnership by a valid premarital agreement; (2) excluded from the marital partnership by a valid contract; (3) "acquired by the spouse-owner during the marriage by gift or inheritance, . . . was expressly classified by the donee/heir-spouse-owner as his or her separate property, and . . . was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property." Kakinami v. Kakinami, 127 Hawai'i 126, 147, 276 P.3d 695, 716 (2012) (citations and emphasis omitted).

The family court was authorized to order temporary support for Dorinda "as the court may deem fair and reasonable . . . ." HRS § 580-9 (1993). "[F]inancial resources of the husband" are given "due consideration" in awarding the spouse temporary support. Richards v. Richards, 44 Haw. 491, 496-97, 355 P.2d 188, 193 (1960). There was no abuse of discretion in the family court's consideration of David's financial resources in ordering temporary spousal support for Dorinda.

4.

David's final contention is that the family court erred by awarding Dorinda attorneys' fees and costs. Similar to his argument regarding the family court's award of temporary alimony, David contends the family court abused its discretion by fashioning an award that required him to "invade" what would eventually be categorized as his separate property. He further contends the family court lacked jurisdiction to award Dorinda an additional $5,000 in attorneys' fees in its August 14, 2013 Order Re: Fees and Costs because the parties' notices of appeal and cross-appeal had already been filed.

Under HRS § 580-9, the family court was authorized to award Dorinda attorneys' fees during the pendency of the divorce proceeding. See Cain v. Cain, 59 Haw. 32, 42, 575 P.2d 468, 476 (1978). The award of attorney's fees was within the family court's "sound discretion" and was "limited only by the standard that it be fair and reasonable." Cain, 59 Haw. at 43, 575 P.2d

at 476. David contends the family court's total award of $60,450 in attorneys' fees during the pendency of the divorce proceedings constituted reversible error because it required him to use his "separate property inheritance[.]" David points to no authority for this proposition and we find none.

Likewise, we find no error in the family court's orders allocating responsibility for attorneys' fees and costs amongst the parties upon granting the divorce. HRS § 580-47(a)(3) "vests in the trial court the discretion to divide all of the property of the parties, whether community, joint or separate according to what is just and equitable." Cassiday v. Cassiday, 68 Haw. 383, 386, 716 P.2d 1133, 1136 (1986) (internal quotation marks omitted and emphasis added). Under HRS § 580-47(a)(3), the family court was authorized to make further orders that finally divided and distributed David's remaining inheritance monies regardless of whether they were "community, joint, or separate" property. Id.

Further, in issuing orders regarding attorneys' fees and costs and other matters, HRS § 580-47(a) provides:

> **580-47 Support orders; division of property.** (a) Upon granting a divorce . . . (4) . . . the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, or violation of a restraining order[.]

The family court was required to consider, among other factors, the condition each party would be left by the divorce, and this factor was not restricted to the condition of a party in isolation from their marital separate property resources. The family court did not abuse its discretion by awarding Dorinda $5,000 in attorneys' fees and costs in its Order Re: Divorce Trial.

Nor was the family court's August 14, 2013 Order Re: Fees and Costs void for lack of jurisdiction. Generally, "the filing of a valid notice of appeal transfers all jurisdiction in the case to the appellate court and deprives all family courts of jurisdiction to proceed further in the case, except for some matters." Lowther v. Lowther, 99 Hawai'i 569, 578, 57 P.3d 494,

19

503 (App. 2002) (quoting In re Doe, 81 Hawai'i 91, 98, 912 P.2d 588, 595 (App. 1996)). "[E]xceptional matters are collateral or incidental matters[,]" and these include:

> the right to enforce the judgment, matters specified in HRS § 571-54 (1993) and § 580-47 (Supp. 2001), the right under HFCR Rule 60(b) to correct, modify, or grant relief from the judgment but to do so in accordance with the procedure stated in Life of the Land v. Ariyoshi, 57 Haw. 249, 553 P.2d 464 (1976), and the right under Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(e) to correct or modify the record on appeal.

Lowther, 99 Hawai'i at 578, 57 P.3d at 503 (citing TSA Intern. Ltd. v. Shimizu Corp., 92 Hawai'i 243, 256, 990 P.2d 713, 726 (1999)).

The family court's August 14, 2013 Order Re: Fees and Costs confirmed the $5,000 award that had already been set in the February 13, 2013 Order Re: Divorce Trial, which awarded Dorinda "up to $5,000" in attorneys' fees and costs.

## B. Dorinda's appeal

Dorinda contends the family court reversibly erred by finding the approximately $1.5 million David spent during the marriage constituted Category 3 Marital Partnership Property (**MPP**) capital contributions; crediting David for these contributions against the parties' approximately $450,000 Category 5 marital estate; consequently producing a $1.1 million marital loss for which Dorinda would be liable for an approximately $550,000 equalization payment. The family court found sufficient VARCs existed to justify an equitable deviation from partnership principles and thus gave Dorinda a credit equal to her equalization payment. Dorinda argued to the family court that this deviation was not a "meaningful equitable deviation," and contended it did not arrive at a fair division of the parties' original marital assets. Dorinda contends one of the following remedies was appropriate:

> 1. If the entire $3.5 million inheritance is deemed MSP, then none was properly used to reduce the couple's $450,000 marital estate, which should be divided equally under the Partnership Model or awarded primarily to Dorinda by equitable deviation.
>
> 2. If all David's inheritance is deemed MPP Category 3, the $2 million balance should be returned to him, but

none [of] the $1.5 million spent during the marriage would be credited to David or deducted from the Category 5 marital estate, either because the expenditures constituted gifts to the marital estate, or non-marital expenses such as the payment of taxes, or by applying equitable deviation and declining to reduce the size of the divisible Category 5 marital estate.

3. If David's inheritance is in fact a mixture of 60% MSP and 40% MPP, which is how the court ruled, then it should utilize the same approach regarding contribution credits, awarding David his MSP, and excluding credits for family gifts and non-marital expenditures, and deviating from partnership principles by declining to reduce the size of the divisible marital estate.

4. Finally, as a last resort, if the family court utilizes David's inheritance to eliminate the marital estate, and awards him 98% of this couple's joint and separate property, $2.5 million to David and $27,000 to Dorinda, the court should compensate Dorinda for this one-sided property division, by altering and increasing the amount and/or duration of alimony, as suggested in [Tougas, 76 Hawai'i at 27, 868 P.2d at 445] "based on the respective separate conditions of the spouses."

According to Dorinda, "David's strategy effectively insulated all $2.5 million owned by this couple at DOCOEPOT from equitable deviation, leaving Dorinda, despite a finding that deviation was justified and necessary, with only a used car and a $13,000 IRA."

In determining the equitable division of MPP, the family court can

"utilize the construct of five categories of net market values [(NMV)] in divorce cases:

Category 1. *The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM)* but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 2. *The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT . . . .*

Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of

21

> acquisition to the DOCOEPOT.
>
> Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

Helbush v. Helbush, 108 Hawai'i 508, 512, 122 P.3d 288, 292 (App. 2005) (quoting Malek v. Malek, 7 Haw. App. 377, 380-81 n.1, 768 P.2d 243, 246-47 n.1 (1989)).

Under the Partnership Model, family courts generally award parties his or her capital contributions and split the distribution of appreciated value. Kakinami, 127 Hawai'i at 147, 131 n.4, 276 P.3d at 700 n.4. The family court is further guided by partnership principles in governing division and distribution:

> Under general partnership law, "each partner is entitled to be repaid his contributions to the partnership property, whether made by way of capital or advances." Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." Hawai'i partnership law provides in relevant part as follows:
>
> **Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> (a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

Helbush, 108 Hawai'i at 513, 122 P.3d at 293 (internal citations omitted) (citing 59A Am. Jur. 2d Partnership §§ 476, 469 (1987); Gardner v. Gardner, 8 Haw. App. 461, 464-65, 810 P.2d 239, 242 (1991) (quoting HRS § 425-118(a) (1985)).

Dorinda contends the family court erred by excluding David's remaining inheritance from distribution between the parties. Dorinda relies on cases interpreting HRS § 580-47(a), which allows the family court to "make further orders as shall appear just and equitable . . . finally dividing and distributing the estate of the parties . . . whether community, joint, or separate[.]" Citing Kakinami; Schiller v. Schiller, 120 Hawai'i 283, 312, 205 P.3d 548 (App. 2009); Gussin; and Carson. These

authorities provided that the family court would have acted within its discretion if it had distributed part of David's inheritance to Dorinda to achieve a "just and equitable" result. Carson, 50 Haw. at 184, 436 P.2d at 9.

Dorinda contends the family court erred by categorizing inheritance monies David spent during the marriage as capital contributions. She challenges the family court's Finding No. 26, which states that David used his inheritance to "support and maintain the family and the family's lifestyle." In his answer, David refers to his testimony that stated he used monies he withdrew from the Inheritance Account "to take care of his family" and specified that he expended these funds on "marital bills" such as the children's education, and to pay for the family's visit to Boston.

The family court's treatment of David's spent and unspent inheritance funds as MSP implicated its equitable powers under HRS § 580-47(a). The family court's determination that a premarital economic partnership existed was a "relevant consideration" in determining equitable distribution of the parties' property upon granting the divorce. Collins, 133 Hawai'i at 42, 323 P.3d at 1224; Chen v. Hoeflinger, 127 Hawai'i 346, 359, 279 P.3d 11, 24 (App. 2012), as corrected (Mar. 12, 2012) ("[A] family court can consider the parties' contributions during the premarital economic partnership if premarital cohabitation matured into marriage." (citation and internal quotation marks omitted)). The family court did not abuse its discretion in determining that David could be credited for expenditures from the Inheritance Account for household expenses.

However, the family court's equitable division of the parties' property relied, in part, on its finding of a premarital economic partnership that included an illegal marijuana operation. Because the family court's premarital economic partnership finding was in error, its subsequent reliance on that premarital economic partnership to justify equitable deviation constitutes reversible error. Likewise, the family court's finding of a premarital economic partnership was implicated in

the decision to treat David's inheritance as MSP. Because the family court erred by considering property based on an illegal marijuana operation, we decline to affirm its findings regarding the parties' property division.

Dorinda raises several related contentions regarding the family court's alimony award. She contends that the alimony award constitutes reversible error because the family court "should have considered granting her lifetime alimony of $5,000 a month." Such an alimony award, Dorinda argues, could have "cure[d] an unfair property division caused by [MSP.]"

The family court considered factors enumerated in HRS § 580-47(a) in determining its alimony award to Dorinda: (1) Dorinda's income and David's 3.5 million dollar inheritance; (2) Dorinda's limited employability; (3) the 34-year span of their premarital and marital relationship; (4) the parties' relatively higher standard of living after David received his inheritance; (5) the impact of Dorinda's age on her employability; (6) Dorinda's medical expenses; (7) Dorinda's occupations during the marriage; (8) Dorinda's employability; (9) Dorinda's continued need for health insurance and medical and other expenses; (10) David's $12,000 per month expenditures on family support; (11) David's increased ability to pay alimony consequent to moving into the marital home; and (12) Dorinda's increased need for financial assistance upon moving out of the marital home. In addition to considering required factors, the family court was required to "order support and maintenance for a period sufficient to allow completion of the training, education, skills, or other activity, and shall allow, in addition, sufficient time for the party to secure appropriate employment." HRS § 580-47(a). The family court considered all required factors and determined Dorinda would be able to find employment to support herself by the end of December 2016.

The family court specifically found the parties "lived together since 1976 and separated in 2010" and further stated, "[o]ver these approximate 34 years, they have enjoyed a modest life style; raising children together, purchasing and selling

24

real property, operating several businesses, building the marital residence, etc." The family court did not specify whether the parties' premarital operation of "several businesses" or real property purchases included the illegal marijuana operation or real properties allegedly purchased from marijuana operation proceeds. Insofar as Dorinda's alimony award may have been premised, in part, on premarital activities connected to the illegal marijuana operations, we also vacate the alimony award as reversible error. Upon remand, the family court should exclude from its determination of Dorinda's alimony award any consideration of those premarital economic activities connected to the marijuana operation.

## IV. CONCLUSION

We vacate no. 4. "Alimony" and no. 5 "Property Division," of the June 7, 2013 Divorce Decree entered in Family Court of the Third Circuit's and remand this case for further proceedings consistent with this opinion. We affirm all other parts of the June 7, 2013 Divorce Decree.

DATED: Honolulu, Hawai'i, August 29, 2014.

On the briefs:

Rebecca A. Copeland
for Defendant/Appellee/Cross-
Appellant.

Peter Van Name Esser
and
Michael S. Zola
for Plaintiff/Appellant/Cross-
Appellee.

Presiding Judge

Associate Judge

Associate Judge

25